UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
FACEBOOK USER IDS **100011410491352**
ET AL. THAT ARE STORED AT
PREMISES CONTROLLED BY
FACEBOOK, INC.

Mag. No. _____

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Dramous K. Lofton, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for

information associated with a certain Facebook user IDs that are stored at premises owned,

maintained, controlled, or operated by Facebook, Inc. ("Facebook"), a social networking

company headquartered in Menlo Park, California.  The information to be searched is described

in the following paragraphs and in Attachment A.  This affidavit is made in support of an

application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A), and

3512(a), to require Facebook to disclose to the government copies of the information (including

the content of communications) further described in Section I of Attachment B.  Upon receipt of

the information described in Section I of Attachment B, government-authorized persons will

review that information to locate the items described in Section II of Attachment B, using the

procedures described in Section III of Attachment B.

2.      The information requested in this search warrant is being sought pursuant to a

request for assistance ("Request") from the Federal Office of Justice in Bonn, Germany,

transmitted to Washington, D.C., on or about August 31, 2017.  Authorities in Germany are

investigating human smuggling offenses in violation of the criminal laws of Germany,
specifically, sections 52, 53, 95, 96, and 97 of the Criminal Code of Germany. Copies of the
applicable laws are appended to this affidavit.

3.      The Request is made pursuant to the Treaty Between the United States of
America and the Federal Republic of Germany on Mutual Legal Assistance in Criminal Matters,
U.S.-F.R.G., Oct. 14, 2003, S. TREATY DOC. NO. 108-27 (2004), as supplemented by the
Supplementary Treaty to the Treaty Between the United States of America and the Federal
Republic of Germany on Mutual Legal Assistance in Criminal Matters, U.S.-F.R.G., April 18,
2006, S. TREATY DOC. NO. 109-13 (2006) (hereinafter, the "Treaty"). Under the Treaty, the
United States is obligated to render assistance in response to this Request.

4.      I am a Special Agent with the Federal Bureau of Investigation, and have been
since April of 2011. I am currently assigned to the International Operations Division, Mutual
Legal Assistance Treaty Unit. My current duties include responding to request from foreign
governments pursuant to Mutual Legal Assistance Treaties, including serving as the affiant on
search warrants affidavits, serving search warrants, and reviewing the data received for the
relevance in compliance with parameters of the search warrants. In my past assignments I have
assisted in investigations of federal criminal violations related to high technology or cyber-
crimes. I have gained experience through various trainings and conferences. I have also worked
violent crime and major offender matters, giving me extensive experience in the execution of
search warrants and analysis of collected evidence. I was previously employed for seven years
with the West Haven Police Department, West Haven, Connecticut. There I also drafted and
executed search warrants.

5.      The facts set forth in this affidavit are based upon information conveyed to the United States via the request made pursuant to the Treaty by authorities in Germany and upon my training and experience.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of the criminal laws of Germany have been committed by Ali Hemin Salim ("Salim") and others.  There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband or fruits of these crimes further described in Attachment B.

## JURISDICTION

7.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  *See* 18 U.S.C. § 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court "is acting on a request for foreign assistance pursuant to [18 U.S.C.] section 3512 . . . ." 18 U.S.C. § 2711(3)(A)(iii); *see also* 18 U.S.C. § 3512(a)(2)(B) (court may issue "a warrant or order for contents of stored wire or electronic communications or for records related thereto, as provided under section 2703"), § 3512(c)(3) ("application for execution of a request from a foreign authority under this section may be filed . . . in the District of Columbia").

8.      This application to execute the Request has been approved and duly authorized by an appropriate official of the Department of Justice, through the Office of International Affairs

("OIA").[1]  *See* 18 U.S.C. § 3512(a).  An OIA attorney has authorized the undersigned to file this application.

### PROBABLE CAUSE

9.　　According to authorities in Germany, Salim helped create and run a human smuggling ring that was operating as early as January 2015.  The investigation also concerns other gang members Mashaan Rasool Hamad Kurd, Hasan Haji Ali Khalti ("Khalti"), Asen Kirilov Asenov ("Asenov"), Kadr Sardar Waysar ("Serdar"), and several men known only by the names "Azad," "Hassan," and "Abdul Rahman," and others.  Based on the investigation, Salim appears to have been primarily responsible for logistics, advertising the group's illegal smuggling activities on Facebook, and communicating with people seeking to be smuggled.  The other suspects handled the actual smuggling trips.

10.　　Between January 2015 and February 1, 2017, the smugglers illegally transported an unknown number of migrants from the Middle East to Europe.  Multiple individuals, including four children, died on the journey.  In January 2015, German authorities apprehended five Iraqi nationals who had been illegally smuggled to Rostock by this group.

11.　　In September 2016, German investigators took statements from three witnesses who had been smuggled into Germany by Salim's group on separate trips between July and September 2016.  The witnesses described a consistent process and travel plan.

12.　　Khalti, Serdar, and "Azad" live in Istanbul, Turkey, where they own at least ten apartments for the purpose of accommodating the people to be smuggled.  From the apartments in Turkey, Khalti, along with "Hassan" and "Abdul Rahman," transported the smuggled people

---

[1] The Attorney General, through regulations and Department of Justice directives, has delegated to OIA the authority to serve as the "Central Authority" under treaties and executive agreements between the United States and other countries pertaining to mutual assistance in criminal matters. *See* 28 C.F.R. §§ 0.64-1, 0.64-4, and Appendix to Subpart K, Directive Nos. 81A and 81B (2015).

to the Bulgarian border. Once the smuggled people reached the Bulgarian border, Asenov

transported them via the Bulgaria-Serbia route to other destinations in Europe.

13.     In September 2016, two Kurdish families were brought to the banks of a river at

the Bulgarian border where a rubberized boat was waiting. According to witnesses, they realized

that the boat was not suitable to hold the number of people, but when they refused to get in, the

smugglers forced them into the boat at gunpoint. The boat sank. Six individuals, four of them

children, presumably drowned. Only two bodies have been recovered so far. The survivors were

detained that night by Bulgarian authorities.

14.     Witnesses from other smuggling trips were detained at the Austrian-German

border and questioned by authorities. Witness 1 paid EUR 4,000.00 to be smuggled to Germany

in July 2016. Witness 1 provided German authorities with telephone numbers used by the

smugglers Serdar (00905380650509), Azad (00905384143413), and Asenov (00359877911577).

Witness 2 provided German authorities with contact numbers for Khalti: 009053909033 and

00905051340644. Witness 3 provided a picture of Khalti taken from a Facebook profile.

Witness 3 lost his child when the smugglers forced his group into a dilapidated boat at gunpoint

in the September 2016 trip. He reported that the two families had paid USD 30,000.00 to be

smuggled.

15.     In October 2016, German authorities entered the phone numbers from the

witnesses into Facebook and identified a number of Facebook pages listing the phone numbers as

contact information.[2] The pages openly advertised international smuggling from the Middle East

---

[2] Facebook pages differ from Facebook profiles in that pages are publicly viewable by default. *See* Matt Hicks, *Facebook Tips: What's the Difference between a Facebook Page and Group?*, FACEBOOK (Feb. 24, 2010, 1:40 PM) https://www.facebook.com/notes/facebook/facebook-tips-whats-the-difference-between-a-facebook-page-and-group/324706977130/. Pages are commonly used by businesses and organizations to create a social media presence reaching a broad audience. *Id.*

to various destinations in Europe, Canada, and the United States. Photos on the Facebook pages depicted visas and residence permits. Interested individuals posted comments on the pages that were almost invariably answered with instructions to switch to Facebook Messenger or to Viber.

16.    The telephone number for Serdar provided by Witness 1, 00905380650509, was listed as contact information for Serdar on the Facebook page "Turkey to Europe with guarantee" (page ID 1627930240758627) and "The smuggling route, Schengen visa, Canada and America" (page ID 143333305796334). These pages share additional phone numbers listed for Serdar, including 00905061224056. Both pages include photos of visas, residence permits, and passports for various countries, including Turkey, the United States, and Canada.

17.    Another telephone number listed on the Schengen smuggling site, 00491631171988, was listed as contact information on three additional Facebook pages advertising smuggling services: "European Route" (**page ID 100011410491352**), "Guarantee route Europe" (**page ID: 569632476550988**), and "Guarantee route GB" (**page ID: 1452509108349652**). The pages includes photos of visas, residence permits, and passports for various countries, including Turkey, the United States, and Canada.

18.    In addition, authorities identified two more phone numbers listed as contact information on these three pages: 00491623934461 and 004915756834461. The latter number is connected to a Facebook profile with user ID 100010624634405 that has pictures of Salim on it. Authorities engaged in court-authorized surveillance for this number. On November 1, 2016, Salim spoke with another individual, "Mashaan," about a man's request to smuggle his wife to Germany. Salim and Mashaan spoke again on November 14 and 17, 2016, about different smuggling requests, obtaining visas and passports, and associated costs.

19.     Salim's profile with user ID 100010624634405 was also connected to the phone number 00491631171988, mentioned in the above-paragraph as contact information for three smuggling pages.

20.     The phone numbers 00491631171988, 00491623934461, and 004915756834461 were connected to three additional Facebook pages: "Guarantee Arrival in Britannia and Europe" (**page ID 949939698419748**), "Guarantee Smuggling Route for Europe" (**page ID 1602298666684957**), and "Guarantee Journey to Europe and America" (**page ID 1678907192343351**).

21.     Facebook pages are created by a user with a Facebook profile who is the page's "administrator." *Page Roles*, Facebook, https://www.facebook.com/help/289207354498410?helpref=about_content (Last visited Oct. 26, 2017).  The administrator has the ability to post as the page, send messages as the page, or respond to or delete comments on a page. *Id.*

22.     Basic subscriber information obtained from Facebook for the pages "Guarantee Journey to Europe and America" (**page ID 1678907192343351**), "Guarantee Arrival in Britannia and Europe" (**page ID 949939698419748**), "Way to Europe official visa" (**page ID 1529652740605164),** "Guarantee route GB" (**page ID: 1452509108349652**), and "Guarantee route Europe" (**page ID: 569632476550988)** showed that these pages were created by the Facebook profile with **user ID 100006888900668** that was registered to Hemin Salim using the e-mail account hemin_selimm@hotmail.com.  These pages also have overlapping internet protocol ("IP") addresses with one another and with the profile with **user ID 100006888900668** indicating that they were accessed by the same user: Salim.

23.     Authorities further connected the "Way to Europe official visa" (**page ID 1529652740605164**) page and two other profiles, **user ID 100011201945664** and **user ID 100009601392192**, to Salim. "Way to Europe official visa" (**page ID 1529652740605164**) was created by the profile **user ID 100011201945664**. This profile was connected to the phone number 00491631171988 discussed above, which was linked to other pages and used by Salim to discuss the smuggling business. The profile **user ID 100009601392192** belongs to "Aram Slimane" and has 13 mutual friends with one of Salim's accounts.

24.     German authorities report that the **user ID 100011201945664** and **user ID 100009601392192** are not registered to real people – the profiles were devoid of personal pictures and the phone numbers on the accounts traced to prepaid SIM Cards with fake registration information.

25.     German authorities translated the public portions of "Way to Europe official visa" (**page ID 1529652740605164**), **user ID 100011201945664**, and **user ID 100009601392192**. The accounts all advertise guaranteed routes from Iraq or Turkey to Europe using pictures of passports and fraudulent visas. As with the other identified pages, "customers" ask questions about prices and duration of the journey. In response they are always directed to communicate via Facebook messenger or Viber. Consequently, German authorities suspect these accounts are used to discuss smuggling plans with potential "customers," while protecting the identities of Salim and his collaborators.

26.     IP logs obtained from Facebook for **page ID 1529652740605164**, **user ID 100011201945664**, and **user ID 100009601392192** reflect that they were accessed from the same IP addresses around the same time. Moreover, they share access IP addresses with other

accounts identified above that are directly connected to the smuggling operation. These IP connections suggest that the pages and profiles are being accessed by the same individual.

27.     Authorities searched Salim's home on February 1, 2017. During the search, authorities recovered a mobile phone with a SIM card phone number 009647504092665, which was registered to the profile **user ID 100006888900668**.

28.     Analyzing the mobile phone, German authorities determined that approximately one hour after the search of Salim's home was completed, Salim's profile **user ID 100006888900668** was removed as the administrator from the smuggling Facebook pages that he had previously administered through this profile.

29.     German authorities reviewed many of the smuggling Facebook pages on October 18, 2016, when they started inputting the phone numbers provided by the witnesses into the Facebook search bar. Between that time and January 31, 2017, German authorities periodically checked each page for new posts from individuals looking to be smuggled. German authorities preserved the accounts on January 31, 2017 – the day before they searched Salim's house.

30.     German authorities note that, based on their review, the pages served as instrumentalities facilitating the smuggling. Specifically, the suspects used the pages to find "customers" who they then communicated with through Facebook messenger or Viber. German authorities have found no indication that the pages advertising "routes" to Europe serve any legitimate purpose. Moreover, the profiles: **user ID 100011201945664** and **user ID 100009601392192** appear to have been created solely for the purpose of communicating about smuggling activities and responding to inquiries from "customers."

31.     Because based on my training and experience and the facts of the investigation, it appears that the pages and profiles **100011410491352**, **569632476550988**, **1452509108349652**,

**949939698419748, 1602298666684957, 1678907192343351, 1529652740605164,**

**100011201945664,** and **100000601392192,** were created solely for criminal purposes and served

as instrumentalities of the smuggling scheme, all records for these accounts for all available time

periods are being requested.

32.    Regarding Salim's profile **100006888900668,** which was used to manage the

smuggling Facebook pages, based on my training, experience, and the facts of this investigation,

I believe probable cause exists that the fruits, instrumentalities, and evidence of smuggling

activities will be found in this Facebook account. Accordingly, I submit that there is probable

cause to search the accounts discussed above.

## BACKGROUND CONCERNING FACEBOOK

33.    Facebook owns and operates a free-access social networking website of the same

name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish

accounts with Facebook, and users can then use their accounts to share written news,

photographs, videos, and other information with other Facebook users, and sometimes with the

general public.

34.    Facebook asks users to provide basic contact and personal identifying information

to Facebook, either during the registration process or thereafter.  This information may include

the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook

security questions and answers (for password reset), physical address (including city, state, and

zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook

also assigns a user identification number to each account.  Facebook identifies unique Facebook

accounts by a user's e-mail address, the user ID number, or the username associated with a

Facebook profile.

35.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

36.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

37.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user

and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

38.    Facebook allows users to upload photos and videos, which may include any metadata such as a location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (*i.e.*, label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

39.    Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

40.    If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

41.    Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as

webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

42.  Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

43.  Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

44.  Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

45.  The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page.  Gifts cost money to purchase, and a personalized message can be attached to each gift.  Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

46.  Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

47.  In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

13

48.     Facebook uses the term "Neoprint" to describe an expanded view of a given user

profile. The "Neoprint" for a given user can include the following information from the user's

profile: profile contact information; News Feed information; status updates; links to videos,

photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends'

Facebook user identification numbers; groups and networks of which the user is a member,

including the groups' Facebook group identification numbers; future and past event postings;

rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access

and use of Facebook applications.

49.     Facebook also retains IP logs for a given user ID or IP address. These logs may

contain information about the actions taken by the user ID or IP address on Facebook, including

information about the type of action, the date and time of the action, and the user ID and IP

address associated with the action. For example, if a user views a Facebook profile, that user's

IP log would reflect the fact that the user viewed the profile, and would show when and from

what IP address the user did so.

50.     Social networking providers like Facebook typically retain additional information

about their users' accounts, such as information about the length of service (including start date),

the types of service utilized, and the means and source of any payments associated with the

service (including any credit card or bank account number). In some cases, Facebook users may

communicate directly with Facebook about issues relating to their accounts, such as technical

problems, billing inquiries, or complaints from other users. Social networking providers like

Facebook typically retain records about such communications, including records of contacts

between the user and the provider's support services, as well as records of any actions taken by

the provider or user as a result of the communications.

51.     As explained herein, information stored in connection with a Facebook account

may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal

conduct under investigation, thus enabling the investigating officials to establish and prove each

element or alternatively, to exclude the innocent from further suspicion.  From my training,

experience, and investigation, I know that a Facebook user's "Neoprint," IP log, stored electronic

communications, and other data retained by Facebook, can indicate who has used or controlled

the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of

occupancy" while executing a search warrant at a residence.  For example, profile contact

information, private messaging logs, status updates, and tagged photos (and the data associated

with the foregoing, such as date and time) may be evidence of who used or controlled the

Facebook account at a relevant time.  Further, Facebook account activity can show how and

when the account was accessed or used.  For example, as described herein, Facebook logs the IP

addresses from which users access their accounts along with the time and date.  By determining

the physical location associated with the logged IP addresses, investigators can understand the

chronological and geographic context of the account access and use relating to the crime under

investigation.  Such information allows investigators to understand the geographic and

chronological context of Facebook access, use, and events relating to the crime under

investigation.  Additionally, Facebook builds geo-location into some of its services.  Geo-

location allows, for example, users to "tag" their location in posts and Facebook "friends" to

locate each other.  This geographic and timeline information may tend to either inculpate or

exculpate the Facebook account owner.  Finally, Facebook account activity may provide relevant

insight into the Facebook account owner's state of mind as it relates to the offense under

investigation.  For example, information on the Facebook account may indicate the owner's

15

motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

52.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## CONCLUSION

53.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Facebook, Inc. who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

_____

Dramous K. Lofton
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me on _____, 201___


_____

UNITED STATES MAGISTRATE JUDGE

16

## Relevant Provisions of the Criminal Code of Germany

**Section 52 Concurrence of offenses**
(1) If the same act violates several criminal laws or violates the same criminal law several times, only one sentence shall be imposed.
(2) If several criminal laws were violated, the sentence shall be determined according to the law that threatens the most severe sentence. It must not be milder than the other applicable laws permit.
(3) The court may impose a separate fine in addition to the prison sentence under the prerequisites of section 41.
(4) If one of the applicable laws allows a confiscatory expropriation order, the court may impose it in addition to a prison sentence for life or a fixed term of more than two years. In addition, ancillary penalties and measures (section 11, subsection 1 number 8) can or must be imposed if this is required or allowed by one of the applicable laws.

**Section 53 Multiplicity of offenses**
(1) If a person committed several offenses that are adjudicated at the same time and thus incurred several prison sentences or several fines, an aggregate sentence shall be imposed.
(2) If a prison sentence concurs with a fine, an aggregate sentence shall be imposed. However, the court may also impose a separate fine; if in these cases a fine is to be imposed due several offenses, an aggregate fine shall in this respect be imposed.
(3) If the offender has pursuant to the law according to which section 43a applies or in the case of section 52 subsection 4 incurred as an individual sentence a prison sentence for life or a fixed term of more than two years, the court may impose a confiscatory expropriation order in addition to the aggregate sentence to be formed according to subsection 1 or 2; if in these cases a confiscatory expropriation order is to be imposed due to several offenses, an aggregate confiscatory expropriation order shall in this respect be imposed. Section 43a subsection 3 shall apply mutatis mutandis.
(4) Section 52 subsections 3 and 4 sentence 2 shall apply mutatis mutandis.
. . .
c) Definitions
The term "gang"
According to the case law of the Federal Court of Justice, the term "gang" requires that at least three persons came together who have expressly or tacitly, but in any case in agreement united for committing continued offenses that have not yet been determined in detail.

The term "offense committed by a gang"
According to the case law of the Federal Court of Justice, the commission of an offense "as a member of a gang" requires, in addition to a participation in the individual offense, an involvement in the overall agreement. Moreover, another member of the gang must participate in the commission of the offense. According to the case law, the participation of another member of the gang does not require that at least two members of the gang work together at the same time and in the same place. Accordingly, the term participation means any type of participation in the acts of fraud or falsification of documents that might be considered as contribution to their support.

1

The term "acting for gain"
According to the case law of the Federal Court of Justice, anyone who commits an offense with the intention of obtaining a source of income by continuously committing similar offenses for more than a temporary period of time and in more than an insignificant extent acts for gain.

## Section 95

(1) The following person shall be punished with a prison sentence up to one year or a fine:
>   1. who, contravening section 3 subs. 1 in connection with section 48 subsection 2, resides in the federal territory,
>   2. without the required residence title pursuant to section 4 subs. 1 sentence 1 if
>     >   a) he/she is enforceably required to leave the federal territory,
>     >   b) he/she was not granted a period for departure or if this period expired and
>     >   c) his/her deportation was not suspended;
>   3. who enters the federal territory in contravention of section 14 subsection 1 Nos. 1 or 2,
>   4. (. . .)

## Section 96

(1) The following person shall be punished with a prison sentence of three months up to five years, in less severe cases with a prison sentence up to five years or a fine, who incites another person or assists another person in committing an act
>   1. pursuant to section 95 subsection 1 No. 3 or subsection 2 No. 1 letter a and
>     >   a) receives an advantage or the promise of an advantage for this or
>     >   b) acts repeatedly or for the benefit of several foreigners or
>   2. pursuant to section 95 subsection 1 No. 1 or No. 2, subsection 1a or subsection 2 No. 1 letter
>   b or No. 2 and receives an advantage or the promise of an advantage for this.
>     >   ( . . . )

(4) Subsection 1 No. 1 letter a, No. 2 subsection 2 No. 1, 2 and 5 and subsection 3 shall be applied to violations of legislative provisions concerning the entry and residence of foreigners into the territory of the member states of the European Union or of a Schengen state, if
>   1. they correspond to the acts specified in section 95 subsection 1 No. 2 or 3 or subsection 2 number 1 and
>   2. the offender supports a foreigner who does not have the nationality of a member state of the
>   European Union or of another contracting state to the Treaty on the European Economic Area.

( . . . )

## Section 97

(1) Anyone who causes the death of the smuggled person in the cases of section 96 subsection 1, also in connection with section 96 subsection 4, shall be punished with a prison sentence of at least three years.

(2) Anyone who acts for gain as member of a gang which has come together to commit such offenses on a continuing basis in the cases of section 96 subsection 1, also in connection with section 96 subsection 4, shall be punished with a prison sentence of one year up to ten years.

## ATTACHMENT A
### Property to Be Searched

This warrant applies to information associated with **100011410491352**,

**569632476550988**, **1452509108349652**, **949939698419748**, **1602298666684957**,

**1678907192343351**, **100011201945664**, **100009601392192**, **1529652740605164**, and

**100006888900668** that is stored at premises owned, maintained, controlled, or operated by

Facebook, Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized and Procedures
### to Facilitate Execution of the Warrant

**I.      Information to be disclosed by Facebook, Inc. (the "Provider") to facilitate
         execution of the warrant**

To the extent that the information described in Attachment A is within the possession,

custody, or control of the Provider, including any messages, records, files, logs, or information

that has been deleted but is still available to the Provider, or has been preserved pursuant to a

request made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following

information to the government for each account or identifier listed in Attachment A (each an

"Account"):

(a)      The contents of any available messages sent, received, or deleted by the user(s),

as well as all messages in storage under, and associated with, any preservation numbers

associated with the account, and all headers and originating Internet Protocol ("IP")

addresses, (including, but not limited to, e-mails, postings, chats, unsent messages,

photographs, videos, recordings, images, or communications of any kind) for the

following time periods:

(i) with respect to **100011410491352**, **569632476550988**, **1452509108349652**,

**949939698419748**, **1602298666684957**, **1678907192343351**, **100011201945664**,

**100009601392192**, and **1529652740605164**, for all available time periods; and

(ii) with respect to **100006888900668**, for the time period beginning January 1,

2015, through and including February 7, 2017;

(b)      All records or other information regarding the identification of the Account, to

include full name(s), physical address(es), telephone number(s), other identifiers, log-in

credentials, profile for the user(s), records of session times and durations, the date on

which the Account was created, the length of service, the types of all account services

utilized or linked to the account, the IP address used to register the account, log-in IP

address(es) associated with session times and dates pertaining to the Account for the time

periods specified next to the relevant Account in paragraphs (a)(i) and (ii) above, account

status, e-mail address(es) provided during registration, methods of connecting, log files,

means and source of payment (including any credit or bank account number), and any

account(s) linked by machine cookies (meaning all accounts that logged into Facebook

via the same machine as the Account);

(c)     All records or other information for the time periods specified next to the relevant

Account in paragraphs (a)(i) and (ii) above, stored by an individual using the Account,

including address book(s), contact and buddy list(s), pictures, and files; and

(d)     All records pertaining to communications between the Provider and any person

regarding the Account, including contacts with support services and records of actions

taken.

The Provider shall deliver the information set forth above via United States mail or

courier to:  Special Agent Dramous K. Lofton, Federal Bureau of Investigation, J. Edgar Hoover

Building, MLAT Unit, Room 7848, 935 Pennsylvania Ave., NW, Washington D.C. 20535-0001;

Or email to HQ_ISP_MLAT_Returns@FBI.gov.

## II.  Information to be seized by the government

(a)  For the accounts **100011410491352, 569632476550988, 1452509108349652, 949939698419748, 1602298666684957, 1678907192343351, 100011201945664, 100009601392192,** and **1529652740605164** listed on Attachment A, which were used as a means to commit smuggling offenses in violation of the criminal laws of Germany, specifically, sections 52, 53, 95, 96, and 97 of the Criminal Code of Germany, all information and records described above in Section I.

(b)  For the account **100006888900668** listed on Attachment A, all information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of smuggling offenses in violation of the criminal laws of Germany, specifically, sections 52, 53, 95, 96, and 97 of the Criminal Code of Germany, including information pertaining to the following matters:

(i) Files, documents, video, photographs, recordings, images, or any other communications involving the Account regarding Ali Hemin Salim ("Salim"), Mashaan Rasool Hamad Kurd, Hasan Haji Alo Khalti, Asen Kirilov Asenov, Kadr Sardar Waysar (also known as "Serdar"), and several men known only by the names "Azad", "Hassan" and "Abdul Rahman," or regarding Salim and other unidentified individuals, pertaining to the human smuggling offenses under investigation;

(ii) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(iii) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s); and

(iv) Identification of coconspirators, accomplices, and aiders and abettors in the commission of the above offenses.

### III.       Government procedures for warrant execution

The United States government will conduct a search of the information produced by the Provider and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States and shared with appropriate foreign authorities.

Law enforcement personnel will then seal any information from the Provider that does not fall within the scope of Section II and will not further review the information absent an order of the Court.